# Rutkowski v. Allstate Insurance Company

C.P. of Lackawanna County, no. 02 CV 5473.

*Timothy G. Lenahan,* for plaintiffs.
*Robert G. LaBar,* for defendant.

NEALON, *J.,* November 10, 2004—

## I. PROCEDURAL HISTORY

Plaintiffs William J. Rutkowski and Janet Rutkowski commenced this suit against their insurance carrier, Allstate Insurance Co., alleging breach of contract and bad faith liability in connection with Rutkowski's prop-

erty damage claim for his 1997 Mercury Cougar. (See dkt. entry no. 1.) On April 21, 2004, Rutkowski withdrew the breach of contract claim and proceeded to trial solely on the bad faith claim under 42 Pa.C.S §8371.[1] (*Id.,* no. 24.) A non-jury trial was conducted from June 7, 2004 to June 9, 2004, and the trial transcripts were filed on August 10, 2004, and October 29, 2004. (*Id.,* nos. 43-45.) The factual findings set forth below have been established by clear and convincing evidence and are based upon the testimony and evidence which have been found to be competent, credible, relevant and admissible in this case.

## II. FINDINGS OF FACT

(1) Shortly after 8 a.m. on May 15, 2002, William J. Rutkowski was operating his 1997 Mercury Cougar in a rural area on Route 196 when he struck a deer, lost control of his vehicle and skidded off the roadway and into the adjacent woods. (See transcript of proceedings (T.P.) on 6/8/04, pp. 88-90, 140-43, 209-12.)

(2) Rutkowski contacted 911 via his cell phone and advised the operator that he had struck a deer and that

---

1. Since the success of a bad faith claim is not dependent upon the resolution of the underlying contract claim, see *March v. Paradise Mutual Insurance Co.,* 435 Pa. Super. 597, 601-602, 646 A.2d 1254, 1256 (1994), *appeal denied,* 540 Pa. 613, 656 A.2d 118 (1995), a plaintiff may succeed on a bad faith claim even if [s]he is unsuccessful with the underlying contract claim. *Doylestown Electrical Supply Co. v. Maryland Casualty Ins. Co.,* 942 F. Supp. 1018, 1020 (E.D. Pa. 1996). Thus, a bad faith trial may proceed regardless of the outcome or existence of a contract claim. See *Frederick & Emily's Inc. v. Westfield Group,* 2004 WL 1925007, *3 (E.D. Pa. 2004).

his vehicle was "stuck" in the woods "on top of some rocks." (*Id.,* pp. 93, 144-45.)

(3) At approximately 8:26 a.m. on May 15, 2002, Officer Christopher M. Boheim of the Pocono Mountain Regional Police responded to the 911 call to investigate a "deer vs. car" collision on Route 196. (*Id.,* pp. 3-5, 19.)

(4) Upon arriving at the accident scene, Officer Boheim observed that the Rutkowski vehicle had skidded off the roadway, hit several large rocks and become lodged on top of "earth." (*Id.,* pp. 5, 14-15, 17.)

(5) To the best of his recollection, Officer Boheim believes that Rutkowski informed him that he had struck a deer, lost control and driven off the roadway. (*Id.,* p. 17.)

(6) Officer Boheim concluded that, although the Rutkowski vehicle had sustained apparent damage to its front end and windows, it was nevertheless drivable due to the absence of any clearly visible structural damage that would hinder the safe operation of the vehicle. With Rutkowski's permission, Officer Boheim entered the Mercury Cougar, dislodged it from the woods and backed it onto the roadway. While he was operating the Rutkowski vehicle, Officer Boheim did not notice any oil warning light or dashboard warning light illuminated, and, if he had observed any such warning lights, he would have advised Rutkowski about them. (*Id.,* pp. 5-7.)

(7) After he backed the Mercury Cougar onto the roadway, Officer Boheim performed a "cursory search underneath the vehicle" and did not observe any oil or fluid leaking from the vehicle. If Officer Boheim had observed oil leaking, he would have instructed Rutkowski to have the vehicle towed. (*Id.,* pp. 8-10.)

14

(8) Officer Boheim advised Rutkowski that, since his Mercury Cougar had been involved in a collision, he should take it to an auto mechanic or comparable professional in order to have his vehicle "looked at." (*Id.,* pp. 10, 16.)

(9) Consequently, Rutkowski drove his vehicle to Empire Automotive which is located on Route 196, approximately 6.5 miles from the scene of the accident. (*Id.,* pp. 95-96, 188.) While en route to the repair shop, Rutkowski did not observe any warning lights illuminated indicating any problem with the engine or oil. (*Id.,* pp. 97, 111-12.)

(10) At Empire Automotive, Rutkowski's Mercury Cougar was examined by a mechanic while the vehicle was still operating. Since the vehicle had apparently sustained body damage only and Empire Automotive did not perform body work, the mechanic advised Rutkowski to drive the Mercury Cougar to his home in order to contact Allstate to arrange to have the vehicle examined by a body shop. (T.P. 6/7/04, p. 234; T.P. 6/8/04, pp. 98-99, 157.)

(11) Rutkowski drove the Mercury Cougar from Empire Automotive to his home which is located less than one mile away. (*Id.,* pp. 96, 99-100.) During the ride to his home, Rutkowski did not observe any warning lights which indicated a problem with the vehicle's oil or engine. (*Id.,* pp. 112, 191-92.)

(12) On May 15, 2002, Rutkowski was insured with Allstate under policy no. ********** which provided comprehensive and collision insurance coverages for Rutkowski's 1997 Mercury Cougar. Allstate's policy furnished comprehensive insurance coverage "for direct and accidental loss" to that vehicle which was "not caused

by collision." Allstate's comprehensive insurance provisions stated that "[g]lass breakage, whether or not caused by collision and collision with a bird or animal is covered." Allstate's policy also provided collision coverage pursuant to which Allstate agreed to pay "for direct and accidental loss" to the vehicle "from a collision with another object or by upset of that [vehicle]." (See stipulation of uncontested facts marked as plaintiff's exhibit no. 1, ¶¶3-8.)

(13) Allstate's comprehensive and collision coverages each provided for a deductible of $500. (*Id.,* ¶¶5, 7.)

(14) Allstate's policy states that its property damage "limit of liability is the actual cash value of the property or damaged part of the property at the time of loss," provided that the limit of liability "will not exceed what it would cost to repair or replace the property or part with other of like kind and quality." (Defendant's exhibit no. 1, p. 22.)

(15) Part 4 of the Allstate policy governs property damage claims and contains a provision entitled "subrogation rights" stating that "[w]hen we pay, your rights of recovery from anyone else become ours up to amount we have paid. You must protect these rights and help us enforce them." (*Id.,* p. 24.)

(16) Under the heading "What You Must Do If There Is A Loss," the Allstate policy provides:

"(1) As soon as possible, any person making claim must give us written proof of loss. It must include all details reasonably required by us. We have the right to inspect the damaged property. We may require any person making claim to file with us a sworn proof of loss. We may also require that person to submit to examinations under oath.

"(2) Protect the auto from further loss. We will pay reasonable expenses to guard against further loss. If you don't protect the auto, further loss is not covered.

"(3) Report all theft losses promptly to the police." *(Id.)*

(17) Upon arriving at his residence, Rutkowski parked his vehicle and proceeded to contact Allstate to report his Mercury Cougar property damage loss. Allstate assigned Rutkowski's claim to its physical damage appraiser, Thomas M. Delese. (T.P. 6/8/04, pp. 100, 159-60; stipulation, ¶¶13(a)-(b).)

(18) Delese's initial auto assignment work order classifies Rutkowski's loss as a comprehensive coverage claim and notes "Type of loss: Hit an animal" and "Assignment: 06 Settle/Comprehensive." (Stipulation, ¶18.)

(19) After he reported the claim to Allstate, Rutkowski attempted to start the Mercury Cougar in an effort to move it and discovered that the vehicle was "dead." Therefore, he contacted AAA to tow the vehicle to Empire Automotive where any mechanical damage to the vehicle could be assessed. (T.P. 6/8/04, pp. 100-101, 160-61.)

(20) As the Mercury Cougar was being towed by the AAA operator, Rutkowski and the AAA operator both noticed a puddle of oil on the ground where the vehicle had been located. (*Id.,* pp. 101-102, 165-67.) Once the vehicle was towed to Empire Automotive, Rutkowski contacted Allstate to notify it that the Mercury Cougar had been towed to Empire Automotive. (*Id.,* pp. 102-103.)

(21) On May 16, 2002, Delese inspected the Rutkowski vehicle at Empire Automotive. On that date, Delese

authored an entry in Allstate's computerized claim log which stated "deer hair is present on right front of bumper cover, rear glass broken, right quarter glass broken, right side tires flat, right door mirror scraped (brown) possible tree." (Plaintiff's exhibit 4, p. 2; T.P. 6/7/04, pp. 34-35, 118, 230.)

(22) Allstate's claims representatives are trained to include sufficient information in their computerized claim notes so that other Allstate claims representatives and supervisors will be able to determine precisely what work and investigation have already been performed on a claim by Allstate's claims representatives. (Stipulation, ¶¶59-61; T.P. 6/7/04, pp. 115-16.)

(23) Although Delese's claim log entry states that "deer hair is present on right front of bumper cover," Allstate's front line performance leader (supervisor), Dana Phillips, testified under oath that Delese advised her that deer hair was not present on the Rutkowski vehicle. (T.P. 6/7/04, pp. 272-76.)

(24) After an Empire Automotive mechanic informed Delese on May 16, 2002, that the Mercury Cougar's engine had "seized," Delese contacted Rutkowski, who then proceeded to drive to Empire Automotive to speak to Delese. (Plaintiff's exhibit 4, p. 2; T.P. 6/7/04, pp. 34-36; T.P. 6/8/04, pp. 104-107.)

(25) In response to questions posed by Delese at Empire Automotive, Rutkowski stated that he had been advised by the police officer to drive the vehicle from the accident scene. Rutkowski further informed Delese that no oil or temperature lights illuminated while he was driving the vehicle after the accident. (Plaintiff's exhibit 4, p. 2; T.P. 6/7/04, pp. 35, 117.)

(26) Delese recommended to Rutkowski that he should have his vehicle moved to Tim's Auto Body Shop, Mount Pocono, which was an approved shop under Allstate's "priority repair program," and, for that reason, Rutkowski agreed to have his Mercury Cougar towed to Tim's Auto Body Shop. (T.P. 6/8/04, pp. 108-109, 178-79, 199-200; plaintiff's exhibit 4, p. 2.)

(27) On May 17, 2002, Rutkowski provided an audio-taped interview to Allstate's claims adjuster, Jaclyn Renaldo (Meiners). In response to Renaldo's questions during this taped interview, Rutkowski again stated that his vehicle "went off the road" after it hit a deer, traveled into the woods and "ended up on top of some rocks." When asked by Renaldo whether any "warning lights," "indicator lights" or other "lights came on the dashboard" as he was driving the vehicle from the accident scene, Rutkowski confirmed that he "[d]idn't see anything come on." Rutkowski also informed Renaldo that, after the Mercury Cougar was towed from his driveway by AAA, he "saw something on the ground in [his] driveway." (Plaintiff's exhibit 5, pp. 3, 6-7; T.P. 6/8/04, pp. 184-87.)

(28) On May 17, 2002, Renaldo secured authorization from her supervisor, Dana Phillips, to retain DJS Associates Inc. as cause and origin consultants to inspect Rutkowski's Mercury Cougar and provide an opinion as to the cause of the vehicle's engine damage. (T.P. 6/7/04, pp. 114-15, 118-19,122, 296; plaintiff's exhibit 4, p. 3.) To that end, Allstate forwarded a referral form to DJS stating that "car hit deer, drove vehicle from scene and engine ceased to work." (Stipulation, ¶¶44-45.)

(29) On May 17, 2002, Delese prepared a property damage estimate for the Mercury Cougar which he signed and dated and upon which he affixed his appraisal li-

cense number. Delese's estimate dated May 17, 2002, identifies 42 items of damage costing $4,429.09 to repair or replace. (T.P. 6/7/04, p. 25; plaintiff's exhibit 7.)

(30) Even though Allstate had not yet received a report or preliminary opinion from its cause and origin consultants, nor had DJS even examined Rutkowski's Mercury Cougar, Delese's estimate of the property damage to the vehicle did not include damages for the repair or replacement of the Mercury Cougar's engine. (T.P. 6/7/04, pp. 224, 228.)

(31) By his own admission, Delese never provided Rutkowski with a copy of the damage estimate totaling $4,421.09. (*Id.,* pp. 47-48.)

(32) On May 21, 2002, Joseph F. Grosso of DJS examined the Rutkowski vehicle at Tim's Auto Body Shop. (*Id.,* p. 296; T.P. 6/9/04, pp. 7, 22-26.) At no time did R. Scott King of DJS ever examine the Rutkowski vehicle. (T.P. 6/7/09, p. 296.)

(33) Grosso was not provided with copies of Rutkowski's recorded statement or Delese's claim log notes or repair estimate, nor did Grosso visit the accident scene or Rutkowski's driveway to determine if oil was present there or to measure the distances from the scene to Empire Automotive and from Empire Automotive to Rutkowski's residence. (T.P. 6/9/04, pp. 11-14.)

(34) During his examination of the Rutkowski vehicle, Grosso discovered a quarter size hole in the oil pan which he believes was caused by contact with a hard stationary object. Grosso concluded that oil leaked from the hole in the pan until the engine was eventually depleted of oil and that the metal components in the engine fused or seized together due to the absence of oil. (*Id.,* pp. 23-25, 57, 61, 63, 65-66, 73-74.)

(35) According to Grosso, the oil warning light will illuminate on most standard vehicles when the oil pressure drops to 7 to 10 P.S.I. An engine may only have "half a quart" or a "mouthful" of oil remaining in the engine pan, but still not have the oil pressure drop to 7 to 10 P.S.I. so as to illuminate the oil warning light. However, once the engine and oil pan have been completely depleted of oil, the engine warning light will illuminate. (*Id.,* pp. 33-35, 54-55, 84-85, 100-101.)

(36) According to Grosso, a pool of oil on the ground indicates that the engine is still actively leaking oil at that site and is not yet completely depleted of oil. (*Id.,* pp. 83-84.) When Rutkowski's Mercury Cougar was towed from his driveway, Rutkowski and the AAA operator discovered a puddle of oil on the ground where the vehicle had been located (T.P. 6/8/04, pp. 101-102, 165-67), thereby indicating that the vehicle's engine was still actively leaking oil while it was positioned in the driveway of Rutkowski's residence.

(37) Although Renaldo claims that she discussed DJS's inspection of the vehicle with R. Scott King on May 22, 2002, at which time Mr. King purportedly stated that the engine seized as a result of Rutkowski driving the vehicle from the accident scene, there is no entry in DJS's itemized billing statement which reflects that any such call actually occurred. (T.P. 6/7/04, p. 298; T.P. 6/9/04, pp. 6, 39-40.)

(38) At Delese's suggestion, his supervisor referred the Rutkowski's deer-hit claim to Christine Schreiber of Allstate's Special Investigative Unit (SIU), which investigates fraudulent claims. (T.P. 6/7/04, pp. 194, 196-97.) During the course of her investigation, Ms. Schreiber forwarded an e-mail to Delese asking him to contact her to

discuss what Delese believed were inconsistencies regarding the Rutkowski loss. However, Delese never responded to Ms. Schreiber's electronic inquiry. (*Id.,* pp. 202-206, 228.)

(39) At the conclusion of her investigation, Ms. Schreiber of the SIU unit authored a claim log entry on May 29, 2002, stating that "the struck deer is a legit claim" and that "this is not a case of fraud." (*Id.,* pp. 67-68, 207.) Schreiber contacted Renaldo on that date, informed her that Rutkowski's deer-hit claim was legitimate, and advised her that SIU was returning the file to Renaldo. (*Id.,* pp. 146-47, 208, 220, 222, 228-29.)

(40) Schreiber found no evidence indicating that Rutkowski knowingly operated his vehicle with an oil leak or otherwise took affirmative action that knowingly damaged the vehicle after the collision. (*Id.,* pp. 209-10, 231.)

(41) Delese was never advised of the results of the SIU investigation (stipulation, ¶31), nor did he ever contact the SIU to inquire about its investigation or conclusion, even though Delese was the representative who originally recommended that Rutkowski's claim be referred to the SIU. (T.P. 6/7/04, pp. 63-64.)

(42) On May 29, 2002, DJS prepared a draft report addressing the Rutkowski vehicle's engine damage. With respect to the physical examination of the vehicle while it was located at Tim's Auto Body Shop, the draft report states, inter alia, that "[t]he undercarriage of the Rutkowski vehicle had fresh oil stains and droplets on several suspension components rearward of the engine." (Plaintiff's exhibit 9, p. 2.) Grosso testified that the presence of fresh oil droplets on the suspension component parts indicates that the vehicle was actively leaking oil while it was at that location. (T.P. 6/9/04, p. 94.)

(43) DJS's draft report itemizes four opinions which were formulated as a result of DJS's examination and analysis, and states:

"(1) The hole in the engine oil pan on the Rutkowski vehicle was the result of an impact with an object, such as a road hazard or debris. When the impact occurred and the hole was made, the engine oil leaked out.

"(2) After all or most of the engine oil leaked out, the low oil pressure warning indicator light illuminated.

"(3) *The engine in the Rutkowski vehicle was damaged as a result of the incident.* Furthermore, it was damaged because it was operated for an extended time after the engine oil leaked out and the warning indicator light illuminated. The engine in the Rutkowski vehicle will require full or partial replacement.

"(4) Had Mr. Rutkowski turned the engine off when the vehicle struck the deer or when the low oil pressure warning indicator light illuminated, the engine would not have been damaged except for the damaged oil pan, and would not require full or partial replacement." (Plaintiff's exhibit 9, p. 3.) (emphasis added)

(44) Grosso testified under oath that he cannot state exactly when the oil warning light would have illuminated on Rutkowski's Mercury Cougar nor can he express an opinion within a reasonable degree of certainty whether the warning light would have illuminated when Rutkowski was operating his vehicle after the accident. (T.P. 6/9/04, pp. 72, 86-88, 96-97, 101-102.)

(45) DJS's draft report did not provide Allstate with a reasonable basis for asserting that the engine warning light illuminated while Rutkowski was operating his vehicle after the accident and that Rutkowski continued

to operate his Mercury Cougar with actual or constructive knowledge that it was experiencing oil or engine problems. As a consequence, Allstate had no reasonable basis for invoking the "[p]rotect the auto from further loss" exclusion so as to preclude coverage for the engine damage.

(46) On May 31, 2002, Rutkowski contacted Renaldo to inquire when his vehicle would be repaired and returned to him, and Renaldo responded by advising Rutkowski that she had forwarded a self-explanatory letter to him which would address his questions. (T.P. 6/8/04, pp. 116-17, 201-203.)

(47) In her letter to Rutkowski dated May 31, 2002, Renaldo stated:

"I have carefully examined the circumstances surrounding this accident and have sufficient information at this time to make a decision regarding your subrogation claim.

"Our review of this matter has revealed that this is an issue of whether the damage sustained in this loss is covered under the Allstate Auto Policy. Allstate will pay for direct and accidental loss to the insured auto from a collision with another object or by upset of that auto. The issue here is whether in fact this loss was sudden, direct, and accidental. The facts revealed that you struck something in the roadway causing a hole in the oil pan in the 1997 Mercury Cougar. The loss of oil caused the engine to seize. Your Allstate policy *****-* on page 23 states that you should protect the auto from further loss. You continued to drive the vehicle, as you did not take reasonable care to avoid further damage to the vehicle.

"If you have any questions, please call me at ***-***-**** to discuss my decision." (Plaintiff's exhibit 12.)

(48) Renaldo's denial letter erroneously identifies Rutkowski's property loss claim as a "subrogation claim." (T.P. 6/7/04, pp. 129-30, 178, 243-44.) As noted in ¶15 above, Allstate's policy defines subrogation as referencing a right which Allstate acquires after it has paid the insured's claim. (Defendant's exhibit 1, p. 24.) Thus, as phrased, Renaldo's opening sentence could lead an insured to believe that Allstate had agreed to pay the insured's claim and was issuing a decision relative to Allstate's post-payment subrogation rights.

(49) Although Allstate was treating Rutkowski's loss as a comprehensive claim as of May 31, 2002, Renaldo's denial letter erroneously cites collision coverage language ("direct and accidental loss to the insured auto from a collision with another object or by upset of that auto") in explaining Allstate's alleged basis for its denial. (*Id.,* pp. 135-37, 248-49.) Allstate's claims representative, Anna Verghese, testified that Renaldo and Allstate had a duty under Pennsylvania law to correctly cite the exact provision of the policy relied upon by Allstate when denying a claim. (*Id.,* p. 247.)

(50) At the time that Renaldo advised Rutkowski that his claim was being denied for allegedly failing to protect his Mercury Cougar from further loss, neither she nor Allstate had received a draft or final report from DJS. (*Id.,* pp. 132-33.)

(51) According to Allstate's supervisor, Dana Phillips, Renaldo's denial dated May 31, 2002, was predicated upon Rutkowski driving the vehicle from the scene of the accident to Empire Automotive, rather than for driving the vehicle from Empire Automotive to Rutkowski's home. (*Id.,* pp. 262-63, 293-94.) However, Rutkowski drove his Mercury Cougar from the scene at the direc-

tion of Officer Boheim and no representative of Allstate ever contacted Officer Boheim to confirm or disprove that fact. (*Id.,* pp. 44, 97.) Furthermore, Renaldo and Allstate excluded coverage on this basis despite the fact that Rutkowski had informed them that he did not observe any oil, temperature or warning lights illuminated. (*Id.,* pp. 139-42.) Additionally, no Allstate representative ever visited the accident scene or Rutkowski's driveway to determine whether oil was present at either site. (*Id.,* pp. 126, 128.)

(52) Renaldo's denial letter merely refers to "the damage sustained in this loss" and does not indicate whether Allstate intended to make any type of property damage payment. (*Id.,* pp. 131, 133-34, 246.) Rutkowski interpreted Renaldo's letter of May 31, 2002, as a complete denial of the entire claim by Allstate. (T.P. 6/8/04, p. 117.) Renaldo's supervisor, Dana Phillips, conceded that Renaldo's correspondence, as written, represents that, with the exception of the engine damage, Allstate will cover all of the remaining property damage to Rutkowski's vehicle. (T.P. 6/7/04, pp. 266, 269-70, 288, 291.)

(53) Since Tim's Auto Body Shop had not begun any repairs to Rutkowski's vehicle, Rutkowski had the vehicle transported to Springbrook Collision Repair in Moscow. (T.P. 6/8/04, pp. 110-11.) Richard Fox of Springbrook Collision Repair prepared a property damage appraisal which estimated Rutkowski's loss as totaling $7,341.23. (T.P. 6/7/04, pp. 180-92; plaintiff's exhibit 22.) Based upon Mr. Fox's explanatory testimony at trial, his property damage estimate is found to be competent, credible and most worthy of belief.

(54) At 3:04 p.m. on June 3, 2002, Delese prepared a second estimate which reduced the amount of Rutkow-

ski's property damage claim to $1,405.84 for 13 items of damage. (T.P. 6/7/04, p. 27; plaintiff exhibit 8.) Delese also converted Rutkowski's claim from a comprehensive coverage loss to a collision claim based upon his conclusion that Rutkowski did not strike a deer. (T.P. 6/7/04, pp. 64-66, 107-109.) After he subtracted the $500 deductible from the gross total damage of $1,405.84, Delese forwarded a net check to Rutkowski in the amount of $905.84. (*Id.,* pp. 41-42, 259-60; T.P. 6/8/04, pp. 123-24.)

(55) Delese did not include the cost of the engine damage on either of his estimates since he had concluded that the engine seized as a result of Rutkowski's operation of the vehicle without oil. (*Id.,* pp. 28-29, 56, 78-79.) Delese excluded coverage for the engine damage despite the fact that (a) he never reviewed DJS's report or spoke to Mr. Grosso or Mr. King, and (b) he never contacted Officer Boheim or visited the accident scene or Rutkowski's driveway to determine if oil had leaked there. (*Id.,* pp. 29-31, 38-39, 44-45, 97-98.) Instead, Delese excluded the engine damage from his estimate irrespective of the fact the investigating officer had specifically advised Rutkowski to drive his vehicle from the scene. (*Id.,* pp. 109-11.)

(56) Delese's claim activity log notes that he spoke to Rutkowski on June 3, 2002, and advised him that his "other damages" to the vehicle were not related to the accident on May 15, 2002, since they were "prior" damages. (Plaintiff's exhibit 4, p. 13; T.P. 6/7/04, pp. 103-104.) However, Allstate has not produced a scintilla of evidence suggesting that the damage to the windows and tires on Rutkowski's vehicle was sustained prior to the accident on May 15, 2002. Moreover, when questioned

under oath regarding the damage to the windshield, left quarter panel window and rear window, Delese testified that he "didn't know" whether those damages occurred in the accident. Notwithstanding that fact, he did not include those items of damage on his second estimate. (T.P. 6/9/04, pp. 158-60.)

(57) By virtue of Allstate's conversion of Rutkowski's claim to a collision coverage loss, the accident on May 15, 2002, became a chargeable accident for purposes of Rutkowski's future insurance coverage. (*Id.,* pp. 73-75, 149-50.)

(58) Delese never provided Rutkowski with the first estimate totaling $4,421.09 for 42 items of damage, nor did he disclose to Rutkowski that his second estimate dated June 3, 2002, was a revised estimate which deleted 29 items of damage and reduced the total damages total by $3,015.25. (*Id.,* p. 57.) Indeed, Rutkowski did not even become aware of the existence of the first estimate until after this lawsuit was filed. (T.P. 6/8/04, p. 111.)

(59) Under Allstate's claims handling policies and procedures, both damage estimates prepared by Delese should have been provided to Rutkowski. (T.P. 6/7/04, pp. 155-57.)

(60) Delese testified that he would handle Rutkowski's claim in the exact same manner if it were assigned to him today and still would not conduct a scene inspection, review Rutkowski's photographs or taped statement, or speak to the investigating officer, DJS or the SIU prior to excluding the foregoing items of damage from his second estimate. (*Id.,* pp. 70-72.)

(61) At approximately 4 p.m, on June 3, 2002, Rutkowski submitted to another audiotaped statement

which was conducted by Renaldo. (*Id.,* pp. 285-86.) At that time, Rutkowski provided an identical account concerning the accident, the resultant damage to his vehicle, and the absence of any warning lights indicative of a problem with the engine while he was operating the vehicle after the accident. (Plaintiff's exhibit 6.)

(62) On June 5, 2002, DJS faxed a copy of its draft report dated May 29, 2002, to Renaldo. (T.P. 6/7/04, p. 303; plaintiff's exhibit 9.) DJS's draft report states that "[t]he engine in the Rutkowski vehicle was damaged as a result of the incident." (Plaintiff's exhibit 9, p. 3.)

(63) On June 5, 2002, Renaldo forwarded a letter to Rutkowski stating that Allstate had "written an estimate and issued a check to [Rutkowski] for the damages that have been determined to be related to the loss from 5-15-02." (Plaintiff's exhibit 13.) Renaldo further represented in this letter that "[t]here are several other damaged areas that we are not covering based on the auto tech's [Delese's] inspection and the loss facts given for the accident." (*Id.;* T.P. 6/7/04, p. 155; 6/8/04, p. 205.)

(64) However, at the time that Renaldo authored the denial letter dated June 5, 2002, the SIU had already concluded that Rutkowski's deer-hit claim was legitimate and the draft report prepared by DJS had concluded that "[t]he engine in the Rutkowski vehicle was damaged as a result of the incident." (T.P. 6/7/04, pp. 160-61.)

(65) DJS's invoice for professional services rendered reflects billings on June 5, 2002, for a telephone conference with Renaldo regarding DJS's report, "Review and edit expert report" and a "Memo to file." The DJS invoice further documents a billing on June 13, 2002, for editing and finalizing the expert report. (Plaintiff's exhibit 11, p. 3.)

(66) On June 13, 2002, DJS authored a final report which was forwarded to Allstate. With the exception of an insignificant grammatical correction to the phrase "profession certainty[al]," the only change contained in DJS's report dated June 13, 2002, was the deliberate deletion of the sentence "[t]he engine in the Rutkowski vehicle was damaged as a result of the incident" from the third paragraph of its conclusions. (Plaintiff's exhibit 10, p. 3; T.P. 6/7/04, pp. 143-45, 300-302.)

(67) Allstate paid DJS $1,931.50 for its services rendered in connection with Rutkowski's engine damage claim. (Plaintiff's exhibit 11.)

(68) Rutkowski's original counsel, Kevin P. McAliney, Esquire, forwarded a letter to Dana Phillips on September 3, 2002. (T.P. 6/7/04, pp. 237-41, 280-81; T.P. 6/8/04, pp. 47-48.) In his correspondence, Rutkowski's counsel stated:

"Please advise if there is going to be a new adjuster assigned to handle Mr. Rutkowski's claim or if you will, in fact, be handling this claim.

"I am somewhat puzzled by Allstate's position regarding your refusal to pay Mr. Rutkowski's entire loss given the facts of this case. Mr. Rutkowski has cooperated with Allstate and has given two recorded statements and has also complied with all other requests made by Allstate regarding his claim. Mr. Rutkowski also pointed out to me that this is the first claim he has ever made under his Allstate Auto Insurance policy and has been a long-standing customer of Allstate.

"If I understand your reason for the rejection of Mr. Rutkowski's claim for the loss of his entire vehicle, it is that he failed to take reasonable care to avoid further

damage to his car. There is undisputed evidence from Mr. Rutkowski that, following the accident, he drove the car directly to his auto mechanic for an immediate inspection. A mechanic inspected the vehicle and informed Mr. Rutkowski that the damage appeared to him to be mainly glass and bodywork and that the best thing for Mr. Rutkowski to do is to take the car home and call Allstate. Mr. Rutkowski did this. Mr. Rutkowski told Ms. Renaldo that the distance from where he went off the road to his auto mechanic was perhaps a mile, mile and a half, and the distance from the mechanic to his home was perhaps a half a mile. Mr. Rutkowski also indicated that he did not notice whether the low oil indicator light had come on during this short time. Basically, Allstate is denying Mr. Rutkowski's claim for the loss of his vehicle based upon his alleged failure to notice whether or not the oil indicator light had come on in the short distance he had traveled with his vehicle.

"I have received and reviewed the report prepared by DJS Associates Inc. regarding their investigation. I could find nothing in this report to contradict Mr. Rutkowski's explanation of the accident and his ensuing actions. However, there are several portions of the report which contradict the version of events as reported by Mr. Rutkowski to Allstate and either Mr. Rutkowski's recorded statement was not provided to the investigator or it was just totally ignored as it did not fit the conclusions reached by the investigator. Your expert admits that the low oil pressure warning indicator light would not illuminate until all, or most of the engine oil leaked out. Based upon what Mr. Rutkowski told Ms. Renaldo, most, if not all of the oil had leaked out when it sat in his driveway because Mr. Rutkowski drove the car less than five miles

following the accident. Additionally, there is no indication in your expert's report that the warning indicator light functioned during the short period of time Mr. Rutkowski was in the vehicle.

"Unless you have additional evidence that you have not presented up to this point, Mr. Rutkowski's claim is certainly not a mere disagreement in the appraisal value, but rather based upon Allstate's bad faith in refusing to honor Mr. Rutkowski's claim. The statement of Mr. Rutkowski and your expert's report certainly do not indicate that Mr. Rutkowski failed to safeguard his vehicle following the accident but rather the exact opposite. Following the accident, Mr. Rutkowski immediately brought his vehicle to his mechanic for inspection. Mr. Rutkowski followed the advice of his mechanic and then brought the car home for an inspection by an Allstate claims adjuster. I fail to see how Allstate can say that he failed to safeguard his car following the accident based upon the foregoing.

"I would ask that you re-examine your position in light of the foregoing and contact me so that we may discuss this claim in more detail. If Mr. Rutkowski is forced to put this matter into suit to collect his rightful property damages under this policy of insurance, then we shall be adding the appropriate claims for bad faith and those damages which flow from Allstate's bad faith in handling them. I look forward to hearing from you in regards to the foregoing." (Plaintiff's exhibit 15.)

(69) On September 9, 2002, Anna Verghese of Allstate responded to Mr. McAliney's correspondence by forwarding a three sentence letter which stated: "I am writing in response to your letter dated 09/03/02. I am enclosing copies of both recorded statements taken for

Mr. Rutkowski by Ms. Renaldo as well as the pictures of Mr. Rutkowski's vehicle as requested by you. Allstate's position with regard to this matter remains the same." (Plaintiff's exhibit 16.)

(70) Verghese's letter of September 9, 2002, does not address the various issues raised by Mr. McAliney in his correspondence dated September 3, 2002, nor does it explain Allstate's reasons for its continuing denial. (T.P. 6/7/04, p. 28; T.P. 6/8/04, p. 78.) Furthermore, Verghese herself testified that her continuing denial was only with respect to the engine claim and did not encompass the deer hit issue or other questions raised by Mr. McAliney in his correspondence. (T.P. 6/7/04, pp. 252-53.)

(71) The only expert witness testimony presented by the parties with regard to insurance claims handling standards was offered by James N. Chett, who has more than 40 years of training and experience as a claims representative, supervisor, analyst and administrator, and possesses industry expertise with respect to practices and procedures for handling claims by insureds. (T.P. 6/8/04, pp. 232-35.) Mr. Chett testified convincingly and persuasively that the following actions by Allstate were clear violations of claims handling standards and constituted bad faith conduct:

(a) Delese's failure to provide Rutkowski with a copy of his first written appraisal of damages, together with an indication as to what damages were being covered by Allstate and what other items of damage were either being denied or subject to further investigation by Allstate. (*Id.,* pp. 238-39, 245-46, 270-71, 281-82.)

(b) Delese's exclusion of coverage for windshield damage and other items of damage without first conducting

an adequate investigation, including inspection of the accident scene, contact with Officer Boheim, measurement of the distances driven by Rutkowski after the accident, and assessment of the vehicle's condition prior to the collision. (*Id.,* pp. 239-40.)

(c) Delese's denial of the engine claim without any reasonable basis, particularly since Rutkowski had followed the investigating officer's instructions in operating the vehicle after the accident and Delese never reviewed or received DJS's cause and origin opinion or report prior to denying the engine claim. (*Id.,* pp. 276-77.)

(d) Delese's failure to provide any written explanation for paying $905.84 on a property damage claim worth $7,341.23. (*Id.,* pp. 246-47, 276.)

(e) Renaldo's denial letter of May 31, 2002, which contained incorrect and misleading references to a "subrogation" claim and citations to collision coverage language for a comprehensive coverage "deer-hit" claim. Renaldo's denial letter was also woefully deficient in failing to advise Rutkowski which specific damages were being denied and what items of damage were being covered. (*Id.,* pp. 241-44.)

(f) Renaldo's actions in providing DJS with a selective factual history which intentionally omitted facts that were favorable to Rutkowski in an "attempt at manipulation" designed to influence or affect the conclusions formulated by DJS. (*Id.,* p. 251.)

(g) Allstate's "highly unethical and improper conduct" in urging and convincing DJS to delete the conclusion that "[t]he engine in the Rutkowski vehicle was damaged as a result of the incident" from its formal report.

(h) Allstate's denial of coverage for certain damages on the grounds that a deer hit had not occurred, even though Allstate's SIU had concluded that the deer-hit claim was "legitimate." (*Id.,* pp. 254-55.)

(i) Allstate invoking its "[p]rotect the auto from further loss" exclusion to deny coverage for the engine claim despite the fact that the exclusion is applicable only if the insured knew or should have known that his vehicle was leaking oil and nonetheless proceeded to operate it without oil. (*Id.,* pp. 265, 277-78.)

(j) Allstate ignoring information requests made by Rutkowski and his counsel and inappropriately responding to inquiries with general denials which did not comply with industry standards or Pennsylvania law. (*Id.,* pp. 253-54, 273.)

(k) Allstate's failure to properly supervise its claims representatives whose investigation "didn't even cover the basics that an investigation should cover." (*Id.,* p. 253.)

(l) Allstate's neglect in addressing the concerns raised by Mr. McAliney in his correspondence of September 3, 2002, and its failure to provide any explanation whatsoever for its actions. (*Id.,* pp. 274-75, 282-83.)

(72) Since Rutkowski does not have the funds necessary to repair his vehicle, Rutkowski's Mercury Cougar has remained in its damaged state. (T.P. 6/8/04, pp. 129-30.)

(73) While Rutkowski waited for Allstate to pay for the necessary repairs to his vehicle, he incurred almost two years of storage charges for his Mercury Cougar. (*Id.,* pp. 126-27.)

(74) Rutkowski continues to pay $362.64 per month to Ford Motor Credit for the loan on his Mercury Cougar. (*Id.,* pp. 86-87.)

(75) As a result of Allstate's classification of Rutkowski's loss as a collision coverage claim rather than a comprehensive coverage claim, Rutkowski's auto insurance premiums were increased by Allstate. (*Id.,* p. 130.)

(76) Mr. McAliney's unpaid invoice for services rendered and costs advanced on behalf of Rutkowski is $14,590.18. (T.P. 6/8/04, pp. 60-64, 74-76; plaintiff's exhibit 20.) The unpaid bills for services rendered. and costs advanced by Rutkowski's current counsel, Lenahan and Dempsey P.C., total $117,783.42, comprised of $17,756.92 in costs and $100,026.50 for 405.20 hours of professional services. (T.P. 6/9/04, pp. 122-25, 127; plaintiff's exhibit 21A.)

(77) Allstate's annual reports for the years 2002 and 2003 identify Allstate's net worth as $13,760,542,901 on 12/31/02 and as $16,100,583,494 on 12/31/03. (Plaintiff's exhibit 2.)

## III. DISCUSSION

### (A) *Liability*

Section 8371 of the Judicial Code governs bad faith actions against an insurer by its insured, and provides:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Assess court costs and attorneys' fees against the insurer." 42 Pa.C.S. §8371.

The bad faith statute "authorizes courts, which find that an insurer has acted in bad faith toward its insured, to award punitive damages, attorneys' fees, interest and costs." *Birth Center v. St. Paul Companies Inc.*, 567 Pa. 386, 403, 787 A.2d 376, 386 (2001). To succeed in a bad faith claim, the insured must present clear and convincing evidence that: (1) the insurer did not have a reasonable basis for denying benefits under the policy; and (2) the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. *Toy v. Metropolitan Life Insurance Co.*, 2004 WL 2349550, *11, ¶38 (Pa. Super. 2004); *Hayes v. Harleysville Mutual Insurance Co.*, 841 A.2d 121, 125 (Pa. Super. 2003); *Terletsky v. Prudential Property & Casualty Insurance Co.*, 437 Pa. Super. 108, 125, 649 A.2d 680, 688 (1994).

Section 8371 does not define what conduct constitutes bad faith and the appellate courts have cautioned that "[t]he breach of the obligation to act in good faith cannot be precisely defined in all circumstances." *Zimmerman v. Harleysville Mutual Insurance Co.*, 2004 WL 2190363, *4, ¶13 (Pa. Super. 2004) (en banc). Rather, bad faith claims "are fact-specific and depend on the conduct of the insurer vis-à-vis its insured." *Williams v. Nationwide Mutual Insurance Co.*, 750 A.2d 881, 887 (Pa. Super. 2000). Decisional precedent has described bad faith conduct by an insurer as including "any frivolous or unfounded refusal to pay proceeds of a policy." *Bonenberger v. Nationwide Mutual Insurance Co.*, 791 A.2d 378, 380 (Pa. Super. 2002); *Adamski v. Allstate Insurance Co.*, 738 A.2d 1033, 1036 (Pa. Super. 1999),

*appeal denied,* 563 Pa. 655, 759 A.2d 381 (2000); *Williams, supra.* Since the insurer's conduct in failing to pay a claim must import a dishonest purpose in order to be deemed bad faith, the insured is required to prove that the insurer breached its duty of good faith and fair dealing through some motive of self-interest or ill will. *Brown v. Progressive Insurance Co.,* 2004 WL 2002477, *7, ¶34 (Pa. Super. 2004); *O'Donnell v. Allstate Insurance Co.,* 734 A.2d 901, 905 (Pa. Super. 1999).

Although mere negligence or bad judgment is insufficient to establish bad faith, it is not necessary for the insurer's refusal to be fraudulent. *Bonenberger, supra; Adamski, supra.* For that reason, "bad faith encompasses a wide variety of objectionable conduct." *Brown, supra* at *6, ¶31. By way of illustration, actions by the insurer which are violations of the Unfair Insurance Practices Act are considered to be bad faith conduct under section 8371. *Hayes, supra; O'Donnell,* 734 A.2d at 906. Therefore, an insurer may be liable for bad faith if it fails to conduct a good faith investigation and neglects to communicate promptly with the insured. *Brown, supra* at *6, ¶31 (quoting *Romano v. Nationwide Mutual Fire Insurance Co.,* 435 Pa. Super. 545, 553-54, 646 A.2d 1228, 1232 (1994)). As the Superior Court of Pennsylvania has remarked:

"Individuals expect that their insurers will treat them fairly and properly evaluate any claim they may make. A claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought. An insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to 'send a message.' Rather, it has a duty to compensate its

insureds for the fair value of their injuries. Individuals make payments to insurance carriers to be insured in the event coverage is needed. It is the responsibility of insurers to treat their insureds fairly and provide just compensation for covered claims based on the actual damages suffered. Insurers do a terrible disservice to their insureds when they fail to evaluate each individual case in terms of the situation presented and the individual affected." *Bonenberger,* 791 A.2d at 382.

When considering the merits of a bad faith claim, "one must look at the behavior of the insurer toward the insured and measure its reasonableness . . . to see whether it is perhaps more than mere negligence or bad judgment . . . ." *Ash v. Continental Insurance Co.,* 2004 WL 2453762, *4, ¶15 (Pa. Super. 2004). With respect to the first element of the bad faith standard, the credible evidence clearly and convincingly established that Allstate did not have a reasonable basis for reducing Rutkowski's covered damages to $1,405.84 and completely denying coverage for his engine damage. Allstate's physical damage appraiser converted Rutkowski's loss from a comprehensive claim to a chargeable collision claim and excluded payment for damages to windows, tires, and other items based upon his unfounded conclusion that a deer hit had not occurred. Allstate reached such a frivolous conclusion even though its appraiser had discovered deer hair present on the vehicle and its SIU had determined that the deer-hit claim was legitimate. (See findings of fact, nos. 21, 29, 39, 54, 63-64.) Although the appraiser who denied coverage for these damages acknowledged during his testimony that he "didn't know" whether they were caused by the accident, he nevertheless excluded them from his final estimate. (*Id.,* nos. 56, 71(b), (h).)

As to the engine damage claim, it is beyond dispute that Allstate bears the burden of proving that the "[p]rotect the auto from further loss" exclusion precludes coverage for Rutkowski's engine damage. See *TIG Specialty Insurance Co. v. Koken*, 855 A.2d 900, 908 (Pa. Commw. 2004) (insurer bears the burden of establishing that a policy exclusion precludes coverage); *Spece v. Erie Insurance Group*, 850 A.2d 679, 682 (Pa. Super. 2004) ("[w]here an insurer relies on a policy exclusion as the basis for its denial of coverage . . . , the insurer has asserted an affirmative defense, and accordingly, bears the burden of proving such defense."). To deny coverage based upon its "[p]rotect the auto from further loss" exclusion, Allstate must establish that Rutkowski knew or should have known in the exercise of reasonable care that his vehicle was leaking oil and that he nonetheless continued to drive the vehicle with this actual or constructive knowledge. See 10 Couch on Insurance §149:69 (3d Ed.) (discussing coverage of losses caused directly by insured's neglect to use reasonable efforts to protect damaged property from further harm). Allstate has not cited any case law supporting its proffered denial of coverage for the engine damage, nor has our independent research discovered any such authority. Cf. *Gagon v. State Farm Mutual Automobile Insurance Co.*, 746 P.2d 1194, 1195, 1197 (Utah App. 1987) (holding that trial court erred in granting directed verdict on bad faith claim against insurer which denied engine damage claim of insured who struck the underside of his car on a metal object, "noted that the plastic spoiler under the front grill had been broken," "restarted the car and drove about three miles," "noticed that the car lacked power and that he was unable to drive faster than 45 or 50 miles per hour," and

"[t]owards the end of the three miles, observed that the oil light was on."), *cert. denied,* 771 P.2d 325 (Utah 1988).

Allstate simply has never had any reasonable basis upon which to deny coverage for Rutkowski's engine damage. Allstate's appraiser excluded coverage for the engine damage prior to the time that Allstate's cause and origin consultant, DJS, had even inspected the vehicle, let alone formulated an opinion. (See finding of fact nos. 29-30, 55, 71(c).) The record is devoid of any competent and credible proof that the oil warning light actually illuminated while Rutkowski was operating the vehicle. Rutkowski testified under oath that no warning light ever illuminated and Allstate's cause and origin expert stated that he was unable to express an opinion within a reasonable degree of certainty as to whether the warning light illuminated during Rutkowski's post-accident operation of the vehicle. (*Id.,* nos. 25, 27, 40, 44, 61, 71(i).) In fact, the presence of oil on the vehicle's suspension components and in Rutkowski's driveway indicated that the Mercury Cougar was still actively leaking oil at that site and had not become depleted of oil such that the oil pressure would have dropped below 7 to 10 P.S.I. (*Id.,* nos. 36, 42.) Furthermore, DJS's unedited report concluded that "[t]he engine in the Rutkowski vehicle was damaged as a result of the incident." (*Id.,* nos. 43, 62.) Hence, Allstate's denial of coverage for the engine damage had no credible basis in law or fact.

Allstate's actions in denying full coverage for Rutkowski's property damage claim clearly reflect an unfounded and frivolous refusal that was motivated by Allstate's self-interest or ill will. By way of illustration, Allstate's appraiser noted in his claim activity log that deer hair was present on the right front bumper cover, yet he ex-

pressly advised Allstate's supervisor, Dana Phillips, that no such deer hair was found. (*Id.,* nos. 21-23.) Although Allstate's claims handling policies required the appraiser to provide Rutkowski with both the initial $4,429.09 estimate and the revised $1,405.84 estimate, the appraiser withheld the higher estimate from Rutkowski. (*Id.,* nos. 29, 31, 54, 58-59, 71(a).) This same individual referred Rutkowski's claim to Allstate's fraud unit, but never bothered to contact the SIU regarding its findings before he unilaterally concluded that the deer hit was not a legitimate claim, nor did he even respond to the SIU's electronic inquiry for information justifying his request for such an investigation. (*Id.,* nos. 38, 41.)

Allstate's denial letter of May 31, 2002, was replete with misleading information and citations. (*Id.,* nos. 47-52, 71(e).) Allstate later compounded that misguidance by informing Rutkowski that the same losses in question were being denied as "prior" damages. (*Id.,* no. 56.) When afforded the opportunity to clarify this misinformation, Allstate failed to respond to serial requests by Rutkowski and his counsel. (*Id.,* nos. 66-70, 77(j), (I).) Even more troubling is the fact that Allstate's appraiser who denied Rutkowski's property damage claim on such superficial or nonexistent grounds testified that he would still handle Rutkowski's claim in the exact same manner if it were assigned to him today. (*Id.,* no. 60.)

The credible evidence further establishes clearly and convincingly that Allstate knew of or recklessly disregarded its lack of a reasonable basis for denying Rutkowski's claim and even attempted to conceal the same. In addition to the bad faith conduct discussed in the preceding paragraphs, Allstate affirmatively withheld information or altered documentation in an effort to manu-

facture a basis for its denial of benefits. When Allstate initially retained DJS, it conveniently neglected to provide DJS with factual information that was favorable to Rutkowski in what an insurance industry expert has described as an "attempt at manipulation" of DJS's opinions. (*Id.,* no. 71(f).) After DJS originally concluded that "[t]he engine in the Rutkowski vehicle was damaged as a result of the incident," Allstate convinced DJS to delete that finding from its formal report. (*Id.,* nos. 43, 62, 65-66.) The only expert who testified at trial characterized Allstate's actions in this regard as "highly unethical and improper conduct." Moreover, in denying coverage for other damages on the grounds that a deer hit had not occurred, Allstate ignored the SIU's conclusion and the deer hair findings made by its appraiser. (*Id.,* nos. 21, 39, 71(h).)

Such concealment and manipulation by Allstate clearly and convincingly demonstrates that Allstate knew of or recklessly disregarded its lack of a reasonable basis for denying Rutkowski's claim. Allstate owed Rutkowski a duty of good faith and fair dealing, but woefully failed to fulfill its statutory and contractual obligations. See *Bonenberger,* 791 A.2d at 381 ("An insurance company does owe its insured a duty of good faith and fair dealing, and . . . the insurer remains committed to engage in good faith with its insured."); *Williams,* 750 A.2d at 886 ("Our Supreme Court has stated that 'the utmost fair dealing should characterize the transactions between an insurance company and the insured.' "). In sum, Rutkowski has satisfied his burden of proving Allstate's bad faith by clear and convincing evidence.[2]

---

2. Allstate's actions in this case constitute violations of section 5(a)(10) of the Unfair Insurance Practices Act. See 40 P.S. §§1171.5

## (B) *Damages*

42 Pa.C.S. §8371 provides for the recovery of counsel fees and expenses "to compensate the plaintiff for having to pay an attorney to get that to which they were contractually entitled" and punitive damages "to punish the defendant for its bad faith in failing to do that which it was contractually obligated to do." *Klinger v. State Farm Mutual Automobile Insurance Co.,* 115 F.3d 230, 236 (3d Cir. 1997). Counsel for a party may testify regarding the nature and value of the legal services rendered in a case and the reasonableness of the fees charged. See *Fidelity National Title Insurance Co. of New York v. Suburban West Abstractors,* 852 A.2d 318, 322 (Pa. Super. 2004). Instantly, Rutkowski's former and current counsel testified regarding their unpaid invoices for services rendered and costs advanced on behalf of Rutkowski.

At the time of trial, Allstate's counsel requested bifurcation of this trial and submitted that a separate damages hearing should be conducted at a later date in the event that Allstate was found liable for bad faith. Counsel for Allstate further objected to any fees and costs testimony by Rutkowski's counsel on the grounds that Allstate had not been furnished with copies of their itemized billings until the first day of trial even though they had been requested in discovery. (T.P. 6/7/04, pp. 6-9, 12-16; T.P. 6/8/04, pp. 42-44, 48-60, 228.) In a bench trial under 42 Pa.C.S. §8371, judicial economy supports the determi-

---

(a)(10)(i), (ii), (iii), (iv), (vi), (vii), (x) and (xiv). As observed above, violations of the UIPA are deemed to constitute bad faith, under section 8371. See *Hayes, supra; O'Donnell, supra.*

nation of liability and damages in a single proceeding and without the need for a separate fees and costs hearing. However, since the belated production of the relevant billing statements compromised Allstate's ability to cross-examine Rutkowski's counsel regarding the fairness and reasonableness of those charges, a final decision on the amount of counsel fees and costs recoverable will be deferred pending the completion of a hearing on January 27, 2005, at 9:30 a.m. in courtroom no. 1. During that hearing, additional evidence and arguments concerning the recoverable fees and costs will be received and a ruling on the amount awarded under 42 Pa.C.S. §8371(3) will be made following that hearing.[3]

Section 8371(2) also authorizes the court to award punitive damages against the culpable insurer. A finding of bad faith by the court is the only statutory prerequisite to a punitive damages award under section 8371. *Zimmerman, supra* at *6, ¶20; *Hollock v. Erie Insurance Exchange,* 842 A.2d 409, 418-19 (Pa. Super. 2004) (en banc). For the reasons set forth above, we find that Allstate's bad faith conduct was clearly outrageous and egregious and displayed a reckless indifference toward the rights and interests of Rutkowski. Therefore, Rutkow-

---

3. For example, Rutkowski's lead counsel seeks to recover counsel fees based upon a rate of $275 per hour. (See plaintiff's exhibit 21(a), p. 20.) In his post-trial submissions, Allstate's counsel argues that, since Rutkowski's lead counsel reportedly charged only $177.50 per hour in another bad faith case, *Hollock v. Erie Insurance Exchange,* 54 D.&C.4th 449, 499 (Luzerne Cty. 2002), *aff'd,* 842 A.2d 409 (Pa. Super. 2004), an hourly rate of $275 is not customary and reasonable in Northeastern Pennsylvania. (See defendant's supplemental trial memorandum, p. 4.)

ski is entitled to an award of punitive damages under 42 Pa.C.S. §8371(2).

In assessing punitive damages, the trier of fact should consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause, and the wealth of the defendant. *SHV Coal Inc. v. Continental Grain Co.,* 526 Pa. 489, 493-94, 587 A.2d 702, 704 (1991); *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 102, 555 A.2d 800, 803 (1989); *Phillips v. Cricket Lighters,* 852 A.2d 365, 373 (Pa. Super. 2004). A defendant's net worth has been recognized "as a valid measure of its wealth" for purposes of punitive damages. See *Sprague v. Walter,* 441 Pa. Super. 1, 61-63, 656 A.2d 890, 920 (1995), *appeal denied,* 543 Pa. 730, 673 A.2d 336 (1996); *Ogozaly v. American Honda Motor Co. Inc.,* 104 Lacka. Jur. 354, 357 (2003). Rutkowski and Allstate have stipulated that Allstate's net worth during the relevant time period ranged between $13.7 billion and $16.1 billion.

In determining whether a punitive damages award comports with the due process clause of the Fourteenth Amendment to the United States Constitution, the proportionality between the actual or potential harm suffered and the size of the punitive damages award is relevant. *State Farm v. Campbell,* 538 U.S. 408, 424-26 (2003). See also, *Viener v. Jacobs,* 834 A.2d 546, 561-62 (Pa. Super. 2003), *appeal denied,* 857 A.2d 680 (Pa. 2004); *Reading Radio Inc. v. Fink,* 833 A.2d 199, 215 n.3 (Pa. Super. 2003), *appeal denied,* 577 Pa. 723, 847 A.2d 1287 (2004). Although the United States Supreme Court has declined to impose a bright-line ratio between the actual or potential harm to the plaintiff and the punitive damages award, it has noted "that, in practice, few

awards exceeding a single-digit ratio will satisfy due process." *Hollock,* 842 A.2d at 421 (quoting *Campbell,* 538 U.S. at 525). A greater ratio may be accepted where a particularly outrageous act results in only a small amount of economic damages. *Campbell, supra.* In analyzing the proportionality between the compensatory damages and the punitive damages, the amount of counsel fees and costs awarded is to be included in the compensatory damages figure. *Hollock,* 842 A.2d at 421-22. As a result, the attorneys' fees and costs recoverable by Rutkowski are germane to the amount of punitive damages which may be awarded in compliance with due process standards.

Regrettably, we are unable to fashion a punitive damages award in conformity with *Campbell* until we have first determined the amount of counsel fees and costs recoverable as compensatory damages in this matter. Since a ruling on Rutkowski's counsel fees and costs award will be deferred until the hearing on January 27, 2005, our decision on the punitive damages award must likewise be deferred until that date. In the interim, the parties and their counsel will be directed to participate in a settlement conference before Judge Robert A. Mazzoni on December 16, 2004, at 1:30 p.m.

## IV. CONCLUSIONS OF LAW

Based upon the factual findings and legal discussion set forth above, and in accordance with the clear and convincing standard of proof for statutory bad faith actions, the following conclusions of law are made pursuant to Pa.R.C.P. 1038(b):

(1) Allstate did not have a reasonable basis for denying Rutkowski's property damage claim under the policy.

(2) Allstate knew of or recklessly disregarded its lack of a reasonable basis in denying Rutkowski's claim.

(3) Allstate acted in bad faith toward Rutkowski in contravention of 42 Pa.C.S. §8371.

(4) Rutkowski is entitled to an award of counsel fees and costs pursuant to 42 Pa.C.S. §8371(3).

(5) Rutkowski is entitled to an award of punitive damages against Allstate in accordance with 42 Pa.C.S. §8371(2).

(6) A hearing will be conducted on January 27, 2005, at 9:30 a.m., to receive evidence and arguments regarding the damages recoverable under 42 Pa.C.S. §8371(2) and (3).

(7) A final decision on the damages recoverable under 42 Pa.C.S. §8371 will be rendered following the completion of the hearing on January 27, 2005.

## ORDER

And now, November 10, 2004, based upon the competent, credible, relevant and admissible evidence introduced during the non-jury trial, the memoranda of law submitted by the parties and the oral argument of counsel, and in accordance with the factual findings and legal discussion and conclusions set forth ·in the foregoing decision pursuant to Pa.R.C.P. 1038, it is hereby ordered and decreed that:

(1) A verdict is entered in favor of the plaintiffs, William J. Rutkowski and Janet Rutkowski, and against the defendant, Allstate Insurance Co., pursuant to 42 Pa.C.S. §8371 based upon clear and convincing evidence that the defendant, Allstate Insurance Co., acted in bad faith toward its insureds, William J. Rutkowski and Janet Rutkowski;

(2) A hearing will be conducted on January 27, 2005, at 9:30 a.m. in courtroom no. 1 to receive evidence and arguments relating to the counsel fees, litigation costs and punitive damages recoverable against the defendant, Allstate Insurance Co., and a decision with respect to the amounts awarded for counsel fees, litigation costs and punitive damages will be rendered following the completion of that hearing;

(3) In the interim, the plaintiffs, William J. Rutkowski and Janet Rutkowski, the defendant, Allstate Insurance Co., and their counsel and representatives shall participate in a settlement conference before Judge Robert A. Mazzoni on December 16, 2004, at 1:30 p.m.; and

(4) Pursuant to Lacka. Cty. R.C.P. 212(e), the principals or representatives with the highest level of settlement authority for this case shall attend the settlement conference in person and shall have this matter evaluated and reviewed by all necessary representatives and committees prior to the date of the settlement conference, or suffer the imposition of appropriate sanctions under Lacka. Cty. R.C.P. 212(g).

