John HAYES, Appellee,

v.

HARLEYSVILLE MUTUAL
INSURANCE COMPANY,
Appellant.

Superior Court of Pennsylvania.

Argued Oct. 7, 2003.
Filed Dec. 1, 2003.
Reargument Denied Feb. 13, 2004.

122

Scott Tredwell, Philadelphia, for appellant.

Hugh Hutchison, Philadelphia, for appellee.

Before: STEVENS, OLSZEWSKI, and BECK, JJ.

OLSZEWSKI, J.

¶ 1 This is an appeal from a decision awarding appellee John Hayes (Hayes) damages for the bad faith conduct of his insurer, appellant Harleysville Mutual Insurance Company (Harleysville). Hayes sought underinsured motorist coverage (UIM coverage) in an amount equal to his bodily injury (BI) liability limit from Harleysville following a serious automobile ac-

cident. Hayes's policy provided $100,000 bodily injury liability limits and his underinsured motorist coverage permitted stacking of two automobiles. Harleysville tendered payment of $70,000, based on its opinion that Hayes had requested uninsured and underinsured motorist coverage in the amount of $35,000 with stacking. After a lengthy dispute, Harleysville offered Hayes an additional $130,000 to settle the UIM claim in exchange for a release of a potential bad faith clam. Hayes refused the offer, proceeded to arbitration on the UIM claim, and filed this bad faith action. Following a non-jury trial, the trial court found that Harleysville lacked a reasonable basis to resist reformation of the UIM coverage and that Harleysville breached its duty of good faith and fair dealing. On appeal, Harleysville contends that the trial court erred: (1) in concluding that there existed no reasonable basis to resist reformation of coverage; (2) in concluding that Harleysville acted in bad faith by failing to disclose or "misrepresenting" the existence of pre–1990 selection forms; (3) in concluding that Harleysville acted in bad faith by attempting to settle the UIM claim together with a potential bad faith; (4) in concluding that there existed sufficient evidence of reckless disregard; and, (5) in awarding punitive damages. After careful review of the record and relevant case law, we affirm.

¶ 2 We begin with the standard that governs our review of this case.

Our standard of review in a non-jury trial is clear. We must determine whether the findings of the trial court are supported by competent evidence and whether the trial judge committed error in the application of law. Additionally, findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as a verdict of a jury and will not be disturbed absent error of law or abuse of discretion.

*Good v. Holstein,* 787 A.2d 426, 429 (Pa.Super.2001) (*quoting Stonehedge Square Ltd. v. Movie Merchants, Inc.,* 454 Pa.Super. 468, 685 A.2d 1019, 1022 (1996), *appeal allowed in part,* 548 Pa. 228, 696 A.2d 805 (1997), *affirmed,* 552 Pa. 412, 715 A.2d 1082 (1998)).

¶ 3 The parties stipulated to the following facts at trial:

In February 1985, Harleysville issued an automobile policy ... to ... Hayes ... with bodily injury liability limits of $100,000. The policy was issued with a declaration sheet reflecting UIM coverage limits of $35,000. The policy ... permitted stacking of UIM coverage. At the time the policy was issued, the selection form required by 75 Pa.C.S.A. § 1734 was not signed by Mr. Hayes. At least semiannually between the date of issue and June, 1990, Mr. Hayes was sent renewal forms accompanied by declaration sheets and premium statements. Mr. Hayes paid each premium statement when due and maintained the Policy in full force and effect. In June 1990, Harleysville submitted a packet of material required by the new amendments to the Motor Vehicle Financial Responsibility Law. The 1990 Forms included .. a selection form containing premium reduction options ... Hayes filled out and signed the "premium reduction option" which included a reference to UIM coverage ... Hayes checked off a box indicating that he wished to continue his current UIM coverage ... Hayes continued his Policy in full force and effect by paying semiannual renewal premiums. On October 20, 1995, Mr. Hayes was involved in a serious automobile accident as a result of which he suffered substantial injuries.

Trial Court Opinion, 10/29/02, at 1–3 (citations omitted).

¶ 4 After receiving evidence at trial, the court arrived at the following facts:

Alvin Krantz, Esquire ... who represented [Mr. Hayes] after he was injured .. endeavored to determine what limits governed Mr. Hayes's underinsured motorist coverage ... He requested from Harleysville ... copies of any "sign-down" forms showing the UIM limits ... Mr. Krantz did not receive a sign-down form, merely a "checkoff" form stating that he wished to continue the coverage then in existence in the period of February 6, 1990 to August 6, 1990 ... On March 9, 1998 ... Harleysville tendered $70,000 to [Hayes]. But Mr. Krantz advised his client to turn down this tender because he believed the actual amount Mr. Hayes was owed was $200,000. Because he put Harleysville on notice as early as October, 1997 of what he believed to be the actual limits of his client's claim, Mr. Krantz sent a letter to Harleysville advising them he would file a bad faith claim.

As a result of Mr. Krantz's request, Harleysville obtained the legal opinion of Theodore P. Winicov, Esquire. After reviewing the facts presented him, and the applicable case law, including *Breuninger v. Pennland,* [450 Pa.Super. 149] 675 A.2d 353 (Pa.Super.1996), Mr. Winicov stated that Harleysville had a reasonable basis to claim plaintiff had $35,000 in underinsured motorist coverage ... Mr. Krantz then immediately demanded an arbitration and demanded that Harleysville name an arbitrator.

In April 1998, Harleysville obtained the representation of outside counsel, James C. Haggerty, Esquire, and Mr. Haggerty assumed the handling of the file as Harleysville's outside legal counsel. Mr. Haggerty had an initial meeting with the underwriter at Harleysville but did not take possession or personally review the underwriting file. Mr. Haggerty saw the 1985 application form and attributed no significance to [it] for an accident that occurred in 1995. Immediately after being retained, Mr. Haggerty obtained and analyzed a copy of the file materials supplied by Harleysville and concluded that the Policy provided $35,000 in UIM coverage, stacked for two vehicles, for an aggregate total of $70,000. Mr. Haggerty's opinion was based on the assumption that appropriate documentation (executed selection forms) had been obtained at the time the original policy was issued but that copies of those forms had been retained in the file of the original agent or were otherwise unavailable.

Shortly before the scheduled arbitration, Mr. Krantz subpoenaed Harleysville's underwriting file. Mr. Haggerty objected to the subpoena on the grounds, in part, that all documents to be used at arbitration had already been identified. The underwriting file was produced by Mr. Haggerty on the day of the scheduled arbitration. The complete underwriting file, when provided, contained the unsigned 1985 election form which Mr. Haggerty had *not* previously seen. At the time the underwriting file was produced, Mr. Haggerty unilaterally advised counsel for Mr. Hayes that application and selection forms not previously disclosed were in the file and, further, that these documents were signed by the agent and not by Mr. Hayes.

Upon discovering the original unsigned election form, Mr. Haggerty immediately wrote a comprehensive opinion letter to Harleysville advising them that the unsigned selection form was defective and that the discovery of this new document required that the insurance policy be reformed to reflect UIM coverage of

$100,000. Mr. Haggerty also recognized that there was exposure for a bad faith claim and provided his legal opinion that the appropriate course of action was to tender the balance of the full $200,000 of stacked UIM coverage independent of any agreement by Mr. Krantz to settle any potential extra-contractual claims. Upon reviewing Mr. Haggerty's opinion, [the claims representative] concurred and recommended to the Home Office that the Policy be reformed to reflect UIM coverage limits equal to the liability limits. Upon receipt and review of Mr. Haggerty's opinion ... Harleysville's Home Office Claims Division Specialist and ... Assistant Vise [sic] President of Harleysville and Director of Litigation, disagreed with his assessment of the legal consequences of the defective 1985 selection forms. As a result, a conference call was conducted on September 5, 1998 involving [the Claims Division Specialist, the Assistant Vice President and Director of Litigation] and Mr. Haggerty during which the issues were discussed at length and possible arguments were reviewed. All participants agreed that, as a matter of law, at least in the period of 1985 to 1990, the actual UIM coverage under the Policy was $100,000 (stacked with two vehicles) and that the declaration sheet forwarded by Harleysville to Mr. Hayes was wrong. After some discussion amidst their representatives Harleysville extended its offer to the plaintiff to the full amount of the reformed policy limit of $130,000. *However*, acceptance of said offer was conditioned on Mr. Hayes extinguishing a possible bad faith claim. Mr. Hayes did not forego the bad faith claim and thereafter prepared to participate with his attorney in a UIM arbitration. The arbitration proceeded and the panel found against Harleysville on the UIM claim. Harleysville thereafter tendered Mr. Hayes a check for $130,000. The bad faith claim then proceeded to [the trial court].

Trial Court Opinion, 10/29/02, at 3–7 (citations omitted) (emphasis added).

¶ 5 These facts, as determined by the trial judge, are reasonably supported by the record. Therefore, our review of this case turns to whether the trial court abused its discretion in finding that these facts amount to bad faith. We determine that the trial court's finding of bad faith is appropriate.

¶ 6 To succeed in an action for bad faith, a plaintiff must "show by clear and convincing evidence that [the insurer] lacked a reasonable basis for denying benefits and that [the insurer] knew or recklessly disregarded its lack of a reasonable basis." *Cresswell v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 820 A.2d 172, 180 (Pa.Super.2003). Further, an insurer may be liable for bad faith conduct if the insurer has violated the Unfair Insurance Practices Act. *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901 (Pa.Super.1999).

¶ 7 We first address whether Harleysville had a reasonable basis on which to resist reformation of the policy. Harleysville argues that the lower UIM coverage limit was requested by Hayes at the policy's inception in 1985, and that Hayes requested a continuation of the lower coverage limit in a 1990 premium reduction option form. Alternatively, if Harleysville inappropriately maintained the reduced coverage limit, no basis for reformation existed because the Motor Vehicle Financial Responsibility Law (MVFRL) does not provide a remedy for this situation. Harleysville also argues that the trial court inappropriately reformed the UIM coverage *ab initio* to avoid the lack of remedy in the MVFRL. Our review of the law and facts in this

case indicates that the trial court was correct in reforming the UIM coverage from the policy inception to the date of the within accident.

¶ 8 Hayes applied for a policy of insurance from Harleysville in 1985. It is undisputed that in 1985 the agent signed a form instructing underwriting to lower the UIM coverage limit. It is clear that Hayes himself never provided *any* type of writing from 1985 to 1990 requesting UIM coverage limits lower than his bodily injury liability limits. Following the enactment of Act VI of 1990, Harleysville issued an Important Notice to Hayes pursuant to 75 Pa.C.S.A. § 1791. Included with the Notice were the Declarations Sheet and a form entitled "Other Premium Reduction Options." The premium reduction form consisted of two pages and indicated that the insured was to "check boxes below to indicate [his] selection." The section of the form relating to UIM coverage set for the following question: "Do you want to continue with your current Uninsured and Underinsured Motorist limits?" Hayes checked "Yes." The form did not indicate the current limit of coverage on the policy. Harleysville argues that even if Hayes did not request a lower UIM limit in 1985, Hayes affirmatively requested a UIM limit of $35,000 when he checked "Yes" on the premium reduction form in 1990. Harleysville relies on a presumption that Hayes knew the policy had only $35,000 of UIM coverage when he answered "Yes" on the premium reduction form, and at all times thereafter.

¶ 9 This Court has held that there is a presumption that an insured had knowledge of their UIM coverage limit if the insurer has issued an Important Notice pursuant to 75 Pa.C.S.A. § 1791, and if the insured has made premium payments following receipt of the Important Notice. *Breuninger v. Pennland Ins. Co.*, 450 Pa.Super. 149, 675 A.2d 353, 357 (1996). We have further held that "in order for the conclusive presumption of Section 1791 to be effective, an insured must have *actually selected coverage,* and the selection process must be in conformity with Section 1734, *i.e.,* the *insured* must have requested *in writing* a lower UM/UIM coverage." *Id.* at 357 (emphasis added). In this case Harleysville did issue the § 1791 Important Notice and Hayes did make several premium payments following receipt of the Notice. Nonetheless, the presumption that Hayes knew his UIM limit was $35,000 when he answered "Yes" on the premium reduction form, or at any time thereafter, cannot be applied to this case. The presumption is invalid because Hayes did not provide Harleysville with the written request selecting the lower UIM coverage limit in 1985—the agent provided the written request. Hence, there is no presumption that Hayes had knowledge that his policy had UIM limits of $35,000. Furthermore, because Hayes never requested the lower UIM limits in 1985, the policy must be reformed *ab initio.*

¶ 10 Harleysville argues that even if the policy must be reformed for the period from 1985 to 1990, the policy had lower UIM limits from 1990 to the date of the accident. Harleysville argues that following the Hayes answer on the premium reduction form, Hayes made premium payments that were computed according to the lower coverage limit. To support its argument, Harleysville relies on *Dang v. State Farm Mut. Auto. Ins. Co.*, 1996 WL 421942. In *Dang,* the district court held that even though the policy had to be reformed for the period prior to Act VI (1990), the insured had actively selected a reduced UIM coverage limit by paying premiums computed on the reduced coverage limit. The district court arrived at that conclusion because, after the passage of Act VI,

State Farm sent the policyholder a form with her renewal premium that read:

> DUE TO A LAW CHANGE .... COVERAGE U HAS BEEN REPLACED WITH NEW UNINSURED AND UNDERINSURED MOTOR VEHICLE COVERAGE U WITH LIMITS TO EQUAL YOUR BODILY INJURY LIABILITY LIMITS. IF YOU WANT THESE COVERAGE LIMITS, PAY THE AMOUNT DUE.
>
> IF YOU WANT COVERAGE U WITH YOUR PREVIOUS COVERAGE U LIMITS OF $15,000/ $30,000, PAY [THIS LOWER AMOUNT].

*Id.* at *3. The insured then chose to pay the premium associated with the limits of $15,000/$30,000.

¶ 11 First, *Dang* is a federal decision and not binding on this Court. Second, the facts of this case are distinguishable from *Dang.* In *Dang,* the insured was clearly advised on the form itself that payment of the reduced premium would lower the coverage to $15,000/$30,000. In the case *sub judice,* the premium reduction form that Harleysville sent to Hayes in 1990 did not indicate the amount of coverage Hayes would receive if he answered "Yes." Hence, *Dang* is not germane to our decision.

¶ 12 We conclude that it was proper to reform the UIM coverage to the amount of $100,000 for the period of 1985 to 1990 because Hayes never authorized Harleysville to reduce the coverage limit. We further conclude that Hayes' signature on the premium reduction form in 1990 continued his UIM coverage in the amount of $100,000 because Harleysville did not establish that Hayes had knowledge that Harleysville issued the policy with only $35,000 of UIM coverage. Therefore, the trial court was correct in finding that Harleysville did not have a reasonable basis to resist reformation of the policy.

¶ 13 Next we address Harleysville's second issue—whether Harleysville acted in bad faith by failing to disclose or misrepresenting the existence of the pre-1990 selection form. We determine that it did.

¶ 14 Hayes's attorney requested the "sign-down" form indicating that Hayes had authorized Harleysville to lower the UIM coverage limit. The claim representative sent the attorney the 1990 form on which Hayes had checked "Yes," indicating that he desired to retain his present level of coverage. When the attorney notified Harleysville that this form did not adequately indicate that Hayes desired to lower his coverage limit, Harleysville responded that the form supplied was the only form in the file. It was after this matter had progressed to the day of the arbitration that Hayes's attorney was given the 1985 form, signed by the agent and not Hayes, that directed underwriting to lower the coverage limit from $100,000 to $35,000. It is apparent to us that the 1985 form was in Harleysville's possession throughout the handling of the claim. Further, it is apparent to us that Harleysville did not make a reasonable effort to research its files to locate the form that was clearly requested by Hayes's attorney. Moreover, Harleysville did not supply the 1985 form to its own counsel until the day of the arbitration. We find that the trial court did not abuse its discretion by determining that this conduct constituted bad faith.

¶ 15 The third issue raised by Harleysville is whether it acted in bad faith by trying to settle the UIM claim together with the potential bad faith claim. The facts of this case are clear that when Harleysville's counsel learned of the 1985 form signed by the agent, he advised Harleysville that Hayes was entitled to $100,000 of UIM coverage. After a discus-

sion between counsel and members of Harleysville's management, Harleysville, with full knowledge that Hayes was entitled to $100,000 of coverage, offered to pay Hayes the full amount of the coverage *only* in exchange for a release of both the UIM claim and any potential bad faith claim. When Hayes refused to sign the release, Harleysville refused to pay the claim and forced the matter into arbitration. Again, we find that the trial court did not abuse its discretion by determining that this conduct constituted bad faith.

¶ 16 Harleysville's fourth issue is whether there existed sufficient evidence of reckless disregard. We believe our discussion above makes the answer to this issue a clear "Yes."

¶ 17 Finally, Harleysville argues that the trial court erred by awarding punitive damages. The remedies for bad faith conduct are regulated by statute.

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

¶ 18 Because the trial court had the authority, by statute, to award punitive damages, we will not find error in its determination to do so.

¶ 19 Order AFFIRMED.