934 A.2d 1218

**Jay BLOOD, Appellee**

v.

**OLD GUARD INSURANCE COMPANY, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 10, 2007.

Decided Nov. 20, 2007.

152

Jeffrey A. Ramaley, Zimmer Kunz, P.L.L.C., Pittsburgh, for Old Guard Ins. Co., appellant.

Teresa Ficken Sachs, Post & Schell, P.C., Philadelphia, for Pennsylvania Defense Institute, appellant amicus curiae.

Michael John Koehler, Nicholas, Perot, Smith, Koehler and Wall, P.C., Erie; Scott B. Cooper, Schmidt Kramer, P.C., Harrisburg, for Jay Blood, appellee.

Mitchell S. Clair, Donald F. Manchel & Associates, Philadelphia, for Pennsylvania Trial Lawyers Ass'n, appellee amicus curiae.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## *OPINION*

Justice BALDWIN.

In this automobile insurance case, we determine how an insured's decision to reduce the limits of his or her liability coverage affects a previous election of uninsured/underinsured motorist ("UM/UIM") coverage at a level less than the liability limits established prior to the reduction. For reasons explained below, we reverse the decision of the Superior Court.

When Michael and Sharon Blood, Appellee's parents, applied to Appellant Old Guard Insurance Company ("Old Guard") for automobile insurance in 1986, they requested $500,000 in liability coverage. While they were therefore eligible for an equal amount of UM/UIM coverage, they elected to reduce their UM/UIM coverage to only $35,000,

albeit with the stacking option. There is no dispute here that execution of the sign-down was proper.

The Bloods later decided to lower their liability coverage limits from $500,000 to $300,000. To this end, on June 16, 2000, the Bloods executed a "coverage selection form," and indicated their desire for $300,000 in liability coverage with an "X" in the space next to that amount. The only other marks on the form included a similar "X" indicating rejection of income loss benefits coverage, and the Bloods' signatures, which they dated. R. 78a. Although the form included choices to select UM/UIM coverage options, the Bloods indicated no selections.[1]

On August 19, 2000, Appellee Jay Blood was injured in a motor vehicle accident and suffered serious injuries. The vehicle in which he was riding was driven by the owner, Jay Soltis, who was insured by State Farm. Appellee was paid the applicable limits of the Soltis policy, which amounted to $25,000. Appellee then sought coverage under the policy issued by Appellant Old Guard.

Old Guard paid $105,000 to Appellee, which, according to Old Guard's interpretation of the policy, represented the limit of stacked underinsured coverage available to Appellee, i.e. $35,000 multiplied by the Bloods' three vehicles. R. 14a. Appellee then filed a declaratory judgment action in which he claimed that the limit of coverage was $900,000, i.e. $300,000 multiplied by the three vehicles on the Bloods' policy. R. 5a. The basis of Appellee's declaratory judgment action is that Pennsylvania's Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.C.S. §§ 1701–1799.7, required Old Guard to secure a new written sign-down of UIM coverage following the Bloods' reduction of liability coverage and that the Bloods at no time signed-down the $300,000 limits of UM/UIM coverage that were available upon their reduction of liability coverage from $500,000 to $300,000. Appellee therefore insisted that the UM/UIM coverage limit is $300,000 stacked. Specifi-

---

1. The coverage selection form included choices of $35,000, $100,000, $250,000, $300,000, $500,000, and $1,000,000 for both uninsured and underinsured motorist coverage. R. 78a.

cally, Appellee relied upon Sections 1734 and 1791. Section 1734 provides as follows:

Request for lower limits of coverage—

A named insured may request in writing the issuance of coverages under section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury.

75 Pa.C.S. § 1734.

Section 1791 provides in relevant part:

It shall be presumed that the insured has been advised of the benefits and limits available under this chapter provided the following notice in bold print of at least ten-point type is given to the applicant at the time of application for original coverage, and no other notice or rejection shall be required:

## IMPORTANT NOTICE

Insurance companies operating in the Commonwealth of Pennsylvania are required by law to make available for purchase the following benefits for you, your spouse or other relatives or minors in your custody or in the custody of your relatives, residing in your household, occupants of your motor vehicle or persons struck by your motor vehicle:

(1) Medical benefits, up to at least $100,000.

(1.1) Extraordinary medical benefits, from $100,000 to $1,100,000 which may be offered in increments of $100,000.

(2) Income loss benefits, up to at least $2,500 per month up to a maximum benefit of at least $50,000.

(3) Accidental death benefits, up to at least $25,000.

(4) Funeral benefits, $2,500.

(5) As an alternative to paragraphs (1), (2), (3) and (4), a combination benefit, up to at least $177,500 of benefits in the aggregate or benefits payable up to three years from the date of the accident, whichever occurs first, subject to a limit on accidental death benefit of up to $25,000 and a limit on funeral benefit of $2,500, provided that nothing contained in this subsection shall be construed to limit, reduce, modify

or change the provisions of section 1715(d) (relating to availability of adequate limits).

(6) Uninsured, underinsured and bodily injury liability coverage up to at least $100,000 because of injury to one person in any one accident and up to at least $300,000 because of injury to two or more persons in any one accident or, at the option of the insurer, up to at least $300,000 in a single limit for these coverages, except for policies issued under the Assigned Risk Plan. Also, at least $5,000 for damage to property of others in any one accident.

Additionally, insurers may offer higher benefit levels than those enumerated above as well as additional benefits. However, an insured may elect to purchase lower benefit levels than those enumerated above.

Your signature on this notice or your payment of any renewal premium evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected.

If you have any questions or you do not understand all of the various options available to you, contact your agent or company.

If you do not understand any of the provisions contained in this notice, contact your agent or company before you sign.

75 Pa.C.S. § 1791 (Notice of available benefits and limits).

Old Guard moved for summary judgment at the close of pleadings and discovery, insisting that the Bloods' changes to the policy in 2000 were motivated by a desire to reduce premiums, and that the $35,000 UM/UIM election made in 1986 remained in effect "[b]ecause the Bloods never sought to change their underinsured motorist coverage following the issuance of the original policy, [and] that coverage remained in effect at the time of the motor vehicle accident in question." R. 36–39a.

The trial court found that the Bloods were always aware of the amount of UM/UIM coverage provided under the policy by virtue of their invoices, and that they never indicated a desire to raise the limits. The trial court granted the motion for

summary judgment and explained in the accompanying memorandum that it found no support for the position advanced by Appellee:

There are no reported cases supportive of the [Appellee's] argument. Moreover, the plain language of [Section] 1791 reads that the "Important Notice" is to be provided to the applicant "at the time of application for original coverage, and no other notice or rejection shall be required."

*Blood v. Old Guard Insurance Company,* No. A.D.2002–969, slip op. at 2, 2003 WL 25429413 (Ct. of Com. Pleas of Crawford Cty. Nov. 20, 2003) (Trial Court op.).

The trial court rejected Appellee's position that a new waiver was needed, and another Section 1791 notice was due, when the liability limits were reduced. *Id.* "Merely changing the liability limits does not represent an 'application for original coverage.'" *Id.* "Instead, changing the liability limits is nothing more than a modification of the existing policy." *Id.* As such, the trial court found that Old Guard had no duty to provide another Section 1791 "Important Notice," or another written sign-down opportunity pursuant to Section 1734. *Id.* The trial court also noted that the Bloods never indicated an intent to increase their UM/UIM coverage, and that even if it were to accept Appellee's position that a new Section 1734 written sign-down was necessary due to the reduction in the liability limits, there is no remedy. Appellee then appealed to the Superior Court, which, in a split *en banc* decision, reversed the trial court. *Blood v. Old Guard Ins. Co.,* 894 A.2d 795 (Pa.Super.Ct.2006).

Appellee raised two issues before the Superior Court. First, he argued that Old Guard had a duty to comply with its coverage selection form, which, in this case, indicated no choice of lower UIM benefits. Since the coverage form indicated no selection of UM/UIM coverage limits, Appellee insisted that "under the MVFRL, the Blood's [sic] policy is presumed to have a UIM coverage limit that is equivalent to the bodily injury liability coverage." *Id.* at 797. The Superior Court was persuaded by this argument, and it drew upon language from *dicta* within its prior decision in *Smith v. The*

*Hartford Ins. Co.,* 849 A.2d 277 (Pa.Super.Ct.2004), *alloc. denied,* 581 Pa. 708, 867 A.2d 524 (2005).

In *Smith,* the Superior Court was faced with resolving whether an insured who previously made an outright rejection of all UIM coverage, but who subsequently raised his liability limits, was entitled to UIM coverage. In that case, the first named insured, Mr. Smith, purchased an automobile insurance policy in 1990 and executed a written waiver form rejecting all UIM coverage. Each renewal notice sent to him by his insurer included notice that the policy provided no UIM coverage. In 1994, the insured increased the limit of liability coverage at the same time he purchased an umbrella policy, however his automobile insurance policy remained in effect, and the policy number did not change. No changes were made to the UIM coverage. *Smith,* 849 A.2d at 279.

Subsequent to the increase in liability insurance described above, Mrs. Smith, the first named insured's wife, was injured in an accident caused by an underinsured driver. Despite the original rejection of UIM coverage altogether, Mrs. Smith argued that coverage existed based on her theorization that the 1990 rejection forms provided by the insurer were non-compliant with the structural mandates of the MVFRL with regard to the form of the waiver, and that the 1990 waiver itself "was neither knowing nor intelligent." *Id.* at 278.[2] The Superior Court rejected all of these arguments, instead finding that Mr. Smith's outright rejection, in 1990, of all UIM coverage was compliant with the MVFRL, and disagreeing with the trial court that the change in liability coverage constituted the creation of a new policy. Therefore, no new Section 1791 "Important Notice" was required. Moreover, the

---

**2.** In *Smith,* the insured's claim before the trial court was based on the argument that the waiver of UIM coverage was not voluntary and knowing. Nevertheless, the trial court decision avoided that issue. Instead, its decision was rendered upon its *sua sponte* analysis of whether the insured's increase of the liability limits required The Hartford to supply a new rejection form. *Id.* at 277, 280. On appeal, the insured again tried to challenge the voluntary and knowing quality of the waiver. However, the Superior Court found this issue to be waived for failure to develop it in the appellate brief. *Smith,* 849 A.2d at 280 n. 4.

Superior Court explained that the original decision to reject all UIM coverage was not drawn into question by a subsequent change in liability limits. *Id.* at 279, 281. The *Smith* court acknowledged the reality that the coverages extended under motor vehicle policies change on a routine basis, as they are renewed and vehicles are bought and sold. Nevertheless, the language of Section 1791 was found to be clear; "the General Assembly has specifically stated that once the applicant has purchased the policy and been informed of the choices available, no other notice or rejection shall be required." *Id.* at 280. However, and most importantly in reference to the matter addressed in the instant case, the *Smith* court opined that, in the context of an insured who has previously signed-down his or her UM/UIM coverage, "when the liability limits change a new request for lower limits must also be submitted or the statutorily mandated equal limits will apply." *Id.* at 281.[3]

Despite this observation, the *Smith* court explained that the facts at issue in the subject case did not give rise to the need for new rejection forms. Relating the nature of a tort coverage election under Section 1705, which is presumptively effective throughout the life of the policy, to an election of UM/UIM coverage, the Superior Court determined that Mr. Smith's initial rejection of all UM/UIM coverage survived the subsequent increase in liability coverage in the absence of an affirmative change made by the insured. *Id.*

---

**3.** For this proposition, the *Smith* court cited generally to the decision of the United States District Court for the Middle District of Pennsylvania in *Cebula v. Royal & SunAlliance Ins. Co.,* 158 F.Supp.2d 455 (M.D.Pa. 2001). In *Cebula,* the District Court held that where an insured *increases* his or her liability coverage, but at no time executed a UM/UIM reduction or waiver or received a Section 1791 notice, that the plain language of the MVFRL, namely Section 1731, required that the amount of UM/UIM coverage, by operation of statute, was equal to the increased amount of liability coverage. The court noted that there was no evidence that the insured ever requested UM/UIM coverage in an amount less than the liability limit. Focusing on the fact that the insureds increased their liability coverage, and following the goal to afford the insureds the greatest possible coverage when interpreting the MVFRL, the policy was reformed to provide UM/UIM coverage equal to the liability limit due to the insurer's noncompliance with Sections 1734 and 1791. *Cebula,* 158 F.Supp.2d at 462.

Turning again to the Superior Court's analysis in *Blood,* the lower court explained that the legislative scheme treats outright rejections of UM/UIM coverage, as in *Smith,* differently from a request to reduce the limits of UM/UIM coverage. *Blood,* 894 A.2d at 797–98. In essence, the *Blood* court found that the purpose of requiring a written waiver of all UM/UIM coverage is tied to providing notice of available coverage to the insured. By contrast, the Superior Court, again relying on *Smith,* explained that the requirement of a written reduction in UM/UIM coverage limits is "to avoid confusion and litigation by providing a presumption that in the absence of an explicit written election, the ... coverage limit is equivalent to the liability coverage limit." *Id.* at 798.

Given this construct, the Superior Court concluded that when the Bloods amended their policy in June of 2000, the effect of their change to the liability limits had the related result of increasing their UM/UIM coverage limits to an equal amount. "Old Guard concedes that there was no rejection of [UM/UIM] coverage contained within this application. Therefore, absent a signed, written election for lesser coverage, the presumed [UM/UIM] coverage limit is the same as the bodily injury liability coverage limit." *Blood,* 894 A.2d at 798. The Superior Court was also persuaded by the fact that the coverage selection form provided choices for UM/UIM coverage, but the Bloods made none. "The sections of the form addressing UIM and UM coverage limits were not crossed off or marked as inapplicable. Nor were these options marked to indicate a specific level of coverage." *Id.* The Superior Court pointed out that Old Guard could have protected itself from this analysis simply by requiring the Bloods to execute a new form indicating the UIM coverage they desired.

Judge Orie Melvin filed a dissent in which she explained that the Bloods' decision to decrease the liability limits did not require "an additional election of reduced UM/UIM coverage...." *Id.* at 799 (Orie Melvin, J., dissenting). Noting that the MVFRL does not include a provision that deals with the issue presented in this case, Judge Orie Melvin would have taken a practical approach to resolving the dispute. In her

view, it made no sense "to reason that the Bloods' written request to *reduce* liability limits could operate to *increase* UM/UIM limits.... [A]t the time of amendment, [the Bloods] already had UM/UIM limits *lower* than the liability limits and that they made *no* request to increase or decrease the present UM/UIM limits." *Id.*

Judge Orie Melvin also rejected the majority's reliance upon the *Smith* case, reasoning it was a "UM/UIM rejection case," and finding its discussion of UM/UIM reductions to be *dicta.* Further, Judge Orie Melvin pointed out that the precedent relied upon in *Smith* for this proposition, namely the *Cebula* decision (see note 3, *supra*), was itself distinguishable; the insured in *Cebula* changed the liability limits but "*had never* submitted a written request to have his UM/UIM coverage be lower than the bodily injury liability coverage," which Judge Orie Melvin found to be a critical different choice than the express reduction previously executed by the Bloods. *Id.* at 800. The dissent would have found the reduction of liability limits to be a modification to the existing policy. The rest of the policy was unmodified and remained in effect, including the original UM/UIM reduction. *Id.* According to Judge Orie Melvin, the MVFRL does not require "an additional sign down form when a prior express reduction of UM/UIM coverage already exists." *Id.* at 799.

The parties' positions in this Court mimic the analyses set forth in the Superior Court's split decision. Both insured and insurer acknowledge that this Court has yet to offer comment on the narrow question presented here.

In short, Old Guard's position is that the Superior Court majority's reliance on *Smith* is misplaced and there is no authority upon which to base a conclusion that a new written request for UM/UIM coverage limits below the liability limits was needed simply because the insured decreased their liability coverage. The *Smith* decision, according to Old Guard, should not have been relied upon by the Superior Court for two reasons. First, *Smith* involved questions related to the outright rejection of all UM/UIM coverage. Thus, Old Guard posits that the *Smith* holding fails to provide a basis to

conclude that an express written election of coverage less than the liability limits should be summarily disregarded where, as here, the liability coverage is subsequently *reduced*. Second, Old Guard points out that the portion of the *Smith* holding cited by the Superior Court in this case was in *dicta*, and should not have been relied upon.

Old Guard reads Section 1734 to require an insured who seeks reduced UM/UIM coverage to make their request in writing but, critically, "[t]he MVFRL does not specify when this request should be made or how it must be made," and there is no expression in the MVFRL that such requests must be made whenever changes to liability limits are requested. Brief of Old Guard at 10, 12–13. "Rather, Sections 1731 and 1734 impose obligations in this respect only in connection with the issuance of policies, not changes to pre-existing policies." *Id.* The form provided to the Bloods was used by Old Guard as both an application and a modification form, which does not violate any provision of the MVFRL. "[T]he selections made reflected only those coverages being changed." *Id.* at 21 (citing the deposition testimony of the Bloods' insurance agent, James Clapper). The Superior Court's suggestion that the form was confusing is not persuasive in the face of the Bloods' prior express written election of $35,000 in UM/UIM coverage and the fourteen years of renewal notices and premium payments, which reminded the insureds of the UM/UIM coverage limits in place. Moreover, we note that the selection of $300,000 in liability coverage was not the only change made by the Bloods on the coverage selection form executed in June 2000. Indeed, the Bloods also specifically rejected income loss benefits coverage by putting an "X" in that choice as well. R. 78a.

Moreover, Old Guard points out that there is no evidence that the insureds requested—or desired—a change to the UM/UIM coverage provided by the subject policy. In support of this conclusion, Old Guard points out that the Bloods enjoyed reduced premiums prior to the subject loss, and that the Superior Court erred in providing the Bloods with coverage for which they never paid. Old Guard insists that the intent of the insureds was obvious and is undisputed; they

made the reduction in liability coverage to reduce their insurance costs. Logically, the Bloods could not have desired or expected an increase in their UM/UIM coverage to derive from their undisputed intention to reduce their insurance costs. The Superior Court should have given effect to their change in coverage and not found an increase resulted from it. Similarly, Old Guard suggests that the decision of the Superior Court is in conflict with the broad cost containment policy that underlies the MVFRL. Brief of Appellant at 17.

Additionally, Old Guard argues that should this Court determine that new written sign-downs are required under circumstances such as these, the fact remains that there is no remedy provided in Section 1734.[4] "[I]n the absence of legislative directive, this Court may not imply the remedy of coverage at liability limits...." Brief of Old Guard at 10, 23.

Appellee, in contrast, contends that the changes made to the liability coverage "triggered" a duty on the part of the Old Guard to provide another Section 1791 notice and, if the insureds wanted reduced UM/UIM coverage, another written reduction evidencing this desire pursuant to Section 1734 was necessary. The change form provided the Bloods with the option to select $35,000 in UM/UIM coverage; they did not. Relying on his interpretation of the MVFRL, then, Appellee insists UM/UIM coverage equal to the new liability coverage limits was put into place by operation of statute, and that the remedy is the same as if the insurer had failed to comply with Sections 1731 and 1734 at the time of original coverage; the statutory default of UM/UIM coverage at liability limits is automatic.[5]

---

**4.** Old Guard notes that this Court's decision in *Lewis v. Erie Ins. Exchange,* 568 Pa. 105, 793 A.2d 143 (2002), which explained that Section 1731's technical requirements for *waiver* of UM/UIM coverage did not translate into a prescription of the form for *reducing* UM/UIM coverage under Section 1734, did not resolve whether a remedy exists for a failure to comply with Section 1734. Old Guard insists the language of Section 1734 does not discuss a remedy for a failure of an insurer to provide a second opportunity to request lower limits of coverage.

**5.** For this proposition, Appellee cites *Hayes v. Harleysville Mutual Ins. Co.,* 841 A.2d 121 (Pa.Super.Ct.2003), *alloc. denied,* 582 Pa. 686, 870

Whether the Bloods intended to reduce their insurance costs is irrelevant, according to Appellee. Rather, Appellee insists the case presents a matter of statutory construction, and suggests this Court's review be focused upon the language of the MVFRL and case law interpreting it, and the concomitant duties imposed upon insurers doing business in the Commonwealth. Therefore, the Superior Court properly relied upon the *Smith* case. Regardless of whether the discussion of changes to UM/UIM coverage was *dicta* in *Smith*, it was not legal error to consider it, as the Superior Court did, because the reasoning employed in *Smith* bears on the instant matter.

This Court has never addressed the narrow question involved here. Thus, we must resolve how to apply the MVFRL to the likely commonplace scenario presented in this matter. As a general proposition, we agree with the characterization of Sections 1731 and 1734 offered by the Third Circuit in *Nationwide Ins. Co. v. Resseguie*, 980 F.2d 226, 230 (3d Cir.1992). Tasked with interpreting the requirements for an effective Section 1734 reduction, the Third Circuit began its statutory construction analysis as follows:

[Section] 1731 is a simple statement whose plain meaning is apparent from its language. It mandates that an insurance company cannot issue a policy in the Commonwealth of Pennsylvania unless it provides UM/UIM coverage equal to the bodily injury liability coverage, except as provided in § 1734.

. . .

[W]e also agree that [Section] 1734's language is plain and the Pennsylvania General Assembly's intention is clear. By its terms, a named insured may lower her statutorily provided UIM coverage limits by requesting in writing of her insurer to do so. The insurance company's obligation to *issue* a policy with [UM/UIM] coverage in an amount equal

A.2d 322 (2005). *Hayes,* however, was a case addressing the failure to secure a written Section 1734 reduction in the context of the original application for coverage. *Hayes* is inapposite due to this critical distinction.

to the policy's bodily injury liability coverage is not relieved unless it has received such a written request.

*Id.* at 231 (emphasis added).[6]

Similarly, we find no ambiguity in these Sections, and the resolution of the instant appeal is straightforward. While we agree with Appellee's insistence that the decision here calls for no inquiry into the subjective intent of the Bloods and their desire to reduce their insurance costs, we otherwise agree with the analysis set forth in Judge Orie Melvin's dissent. This matter is one resolved by application of the unambiguous language of the Sections 1731 and 1734, and we find it fatal that Appellee does not—indeed, cannot—direct this Court to a provision in the MVFRL that requires an insurer to re-comply with the relevant sections of the MVFRL under facts such as these.

The operative facts here are that in 1986 the Bloods executed a written request for UM/UIM coverage of $35,000 stacked, the policy was issued, and for the following fourteen years, Old Guard provided the desired coverage. There are no facts on this record to indicate the insureds ever desired to alter this election. Even if we were persuaded by Appellee's argument that Old Guard failed in its statutorily-mandated duties, we further agree with Old Guard that no remedy exists and that the judiciary is not to create one. *Salazar v. Allstate Ins. Co.*, 549 Pa. 658, 670, 702 A.2d 1038, 1044 (1997). Indeed, the MVFRL does not provide any support for Appellee's position that the Bloods' change of liability coverage had an effect on their otherwise valid Section 1734 reduction. Appellee would have us import into our reading of the language of the relevant portions of the MVFRL his argument that the change here is a delivery or issuance of a policy. This Court is without authority to write new requirements into the MVFRL where the statutory language is without ambiguity.

6. Although faced with a different issue than that presented in the instant matter, the *Resseguie* court was interpreting the same statutory language. There, the Third Circuit went on to hold that only the named insured can make the written request for lowered UM/UIM limits, because it found the language of the MVFRL clear.

The order of the Superior Court is reversed. The matter is remanded to the trial court for entry of judgment consistent with this opinion. Jurisdiction is relinquished.

Chief Justice CAPPY and Justices CASTILLE, SAYLOR, EAKIN, BAER and FITZGERALD join the opinion.